IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT LEWIS,<br><br>Plaintiff,<br><br>v.<br><br>HOKE COUNTY, HUBERT PETERKIN, TIMOTHY RUGG, SAMUEL MORANT, TIMOTHY KAVANAUGH, STANLEY DAVIS, and JOHN DOES 1-5,<br><br>Defendants. | ) | 1:17CV964 |

**MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Robert Lewis alleges that deputies with the Hoke County Sheriff's Office unlawfully searched his home and cars on October 19, 2014 after they arrested him on armed robbery charges. He brought this suit against Hoke County, the sheriff, and various deputies, alleging a violation of his Fourth Amendment rights.[1] and, under North Carolina law, trespass, false arrest, false imprisonment, and a due process violation. *See generally* Compl., Docket Entry 2; Am. Compl., Docket Entry 9.[2] Timothy Rugg, Samuel Morant, Timothy Kavanaugh, and Stanley Davis, the only remaining defendants, have now moved for summary judgment. Defs.' Mot. for Summ. J., Docket Entry 65.

For the reasons stated herein, the Court should grant in part the defendants' motion as to the seizure of the property pending a search warrant and deny in part the defendants' motion as to the protective sweep.

---

[1] As for any state law claims Lewis may have asserted, see *infra* at 16.

[2] In his Amended Complaint, Lewis "realleges and incorporates by reference" portions of his original complaint. *See* Docket Entry 6. Considering Lewis's *pro se* status, this recommendation will treat the two complaints as the operative amended complaint.

## I. FACTS

The following facts are undisputed unless otherwise noted.

On September 21, 2014, an armed man robbed a Family Dollar in Hoke County. *See, e.g.*, Timothy Rugg Decl. ¶ 3 (Sept. 23, 2025), Docket Entry 66-3. The suspect wore dark clothing, black tennis shoes with white bottoms/soles and Velcro fasteners, and a blue piece of cloth covering his face. *See id.* He fled the scene in a dark blue Nissan Titan pickup truck. *See id.* Five days later, another armed robbery took place in Hoke County, this time at a Dollar General. *See id.* The was again a man who wore dark clothing with a blue face covering. *See id.* Two days later, a man robbed anther Dollar General in Hoke County. *See id.* He was armed and wore dark clothing with a blue face covering. *See id.* As of mid-October 2014, law enforcement had not solved the crimes. *See id.* ¶ 4.

However, on October 19, 2014, the case broke. A man robbed a sweepstakes business in Johnston County, and an officer with the Smithfield Police Department identified the suspect as Robert Dwayne Lewis. *See, e.g.*, Timothy Kavanaugh Decl. ¶ 4 (Sept. 23, 2025), Docket Entry 66-4. Lewis fled the scene in a gray Kia Optima registered in his name to 7085 Laurinburg Road in Hoke County, where law enforcement personnel believed he lived. *See id.* Night shift patrol deputies in Hoke County were briefed on the Johnston County robbery. *See id.* They drove by the Laurinburg Road residence and saw a blue Nissan Titan parked at the residence, but they did not see the Kia Optima. *See id.*

When the Hoke County day shift patrol deputies started their shift on October 19, 2014, they had this information and continued to be on the lookout for Lewis. *See id.* ¶ 5. Patrol Deputy Kavanaugh drove to the residence and parked nearby where he surveilled the house for "most of the morning." *See id.* He radioed Shift Sergeant Morant several times throughout the morning to report that he was still surveilling the house, the blue Nissan Titan was still parked at the house, but no other cars had come or gone. *See* Samuel Morant Decl. ¶ 9 (Sept. 22, 2025), Docket Entry 66-2. Kavanaugh also reported that he had not seen anyone – including Lewis – enter or leave the house. *Id.* Morant instructed Kavanaugh to leave the residence and return to his patrol duties. *Id.* ¶ 10.

Later in his shift, at approximately 1:10 p.m., Kavanaugh drove past the residence again. *See* Kavanaugh Decl. ¶ 6. This time he saw a gray Kia Optima, along with the blue Nissan Titan, parked at the house. *See id.* Kavanaugh turned around and parked on the other side of the road from the house. *See id.* ¶ 7. By now, Kavanaugh knew that Johnston County had

issued arrest warrants for Lewis. *See id.*; Morant Decl. ¶ 12.

Several minutes later, a man fitting Lewis's description left the house and walked across the street to the mailbox. *See* Kavanaugh Decl. ¶ 8. Kavanaugh approached the man in his car and radioed the Sheriff's Office. *See id.*

He stopped his car near the man, got out of his car, and approached him. *See id.* ¶ 9. The man identified himself as Robert Lewis. *See id.* Kavanaugh placed Lewis in handcuffs, and Patrol Deputy Davis, who had just arrived, stood watch while Kavanaugh searched Lewis's person and put him in the backseat of the patrol car. *See id.* ¶ 10. Kavanaugh then reported to Morant that he had arrested Lewis. *See id.* ¶ 11.

Kavanaugh walked across the street to the residence and knocked on the front door. *See id.* ¶ 12. An elderly man, Lewis's stepfather, answered the door and came outside on the porch to speak with Kavanaugh. *See id.* He confirmed that Lewis also lived at the house. *See id.* He told Kavanaugh that the Kia Optima belonged to Lewis, the but Nissan Titan was his, although he allowed Lewis to use the truck occasionally. *See id.*

After he spoke with Lewis's stepfather, Kavanaugh stepped towards the Kia Optima, looked through its windows, and saw what appeared to be incriminating evidence but did not open the car doors or disturb the car in any way. *See id.* ¶ 13. He then radioed Morant to report his conversation with Lewis's stepfather and what he had seen inside the Kia. *See id.* ¶ 14.

Morant arrived on the scene and saw Lewis's stepfather standing on the porch. *See* Morant Decl. ¶ 18. He parked near Kavanaugh and Davis and walked over to speak with Kavanaugh for an update. *See id.* After receiving the update, he called Lieutenant Rugg in the Detective Division to report what had happened, including the Smithfield Police Department's identification of their robbery suspect as Lewis, the license plate of the getaway car coming back to Lewis at the Laurinburg Road address, the arrest warrants for Lewis for that robbery, and Hoke County Sheriff's Office's assistance with locating and arresting Lewis. *See id.* ¶ 19. He continued to tell Rugg that deputies had driven by the residence and seen the truck believed to be the suspect car in the Hoke County robberies and the Kia Optima, and that Kavanaugh saw Lewis exit the house and walk across the street, identified the man as Lewis, and arrested him. *See id.*

After finishing the call to Rugg, Morant asked Kavanaugh if there was anyone else in the house; Kavanaugh did not know. *See id.* ¶ 20. So Kavanaugh returned, this time with Morant, to the front porch where Lewis's stepfather was still standing. *See id.* Morant explained that

deputies needed to ensure there was no one inside the house for officer security. *See id.* Deputies "did not know whether [Lewis] had any accomplices." *See* Kavanaugh Decl. ¶ 15. Lewis's stepfather said that his wife was not home and no one else was there. *See* Morand Decl. ¶ 20. But "in order to be sure, as taking the word of a stranger in a situation like this was a very risky proposition," *id.*, Morant and Kavanaugh asked if they could "conduct a quick security sweep inside of his house," *see id.*; Kavanaugh Decl. ¶ 15. Lewis's stepfather told Morant and Kavanaugh that he did not have a problem with that and to do what they needed to do. *See* Morant Decl. ¶ 20; Kavanaugh Decl. ¶ 15.

Morant and Kavanaugh then conducted a protective sweep of the inside of the residence. *See* Morant Decl. ¶ 20; Kavanaugh Decl. ¶ 15. They claim their sweep took no more than two minutes, *see, e.g.*, Kavanaugh Decl. ¶ 15, but Lewis avers that they were in the house from approximately 2:00 p.m. to just after 3:00 p.m., according to the watch he was wearing at the time, *see* Lewis Decl. ¶¶ 3-4.

They did not find anyone inside the house and state they did not "touch or disturb anything in the house, nor did [they] conduct any sort of search for evidence." *See, e.g.*, Kavanaugh Decl. ¶ 15. According to Lewis, though, his two unlocked cellphones were in his bedroom at the time, and the cellphones contained intimate photographs and videos. *See* Lewis Decl. ¶ 5. And when Kavanaugh was taking Lewis to the Sheriff's Office, he told Lewis that he and Morant "had already searched through [his] bedroom and saw some very interesting things in [his] cellphone that [he] didn't have to worry about anymore because [he] was going to prison." *See id.* ¶ 7.

While Kavanaugh and Morant were in Lewis's house, Lewis saw Davis walking in the yard photographing the inside of the Nissan Titan and the Kia Optima, as well as the storage barn in the backyard. *See id.* ¶ 6.

Rugg then called Morant and told him to secure the residence until deputies could obtain a search warrant for the residence and cars. *See* Morant Decl. ¶ 21; Timothy Rugg Decl. ¶ 7 (Sept. 23, 2025), Docket Entry 66-3. Davis and others remained at the scene while detectives obtained a search warrant for the premises. *See, e.g.*, Stanley Davis Decl. ¶ 10 (Sept. 26, 2025), Docket Entry 66-1. After an hour and a half, Davis left to resume his regular patrol duties, and other deputies continued to secure the premises. *See id.* ¶ 11.

All the while, Lewis remained at the scene in the back of Kavanaugh's patrol car; at some point, he began to feel sick and nauseated, so deputies called Emergency Medical Services. *See* Kavanaugh Decl. ¶ 17. Emergency Medical Technicians evaluated Lewis for approximately fifteen minutes and determined that he was not in any

medical distress. *See id.* ¶ 18. And Lewis declined the offer to go to the hospital or receive any additional medical attention. *See id.*

According to Kavanaugh, "[a]t some point in time," a deputy escorted Lewis into his home to use the restroom, *see id.* ¶ 19, but Lewis denies he ever went back inside his house after his arrest, *see* Lewis Decl. ¶ 8.

Rugg then called Detective Tart to draft the search warrant for Lewis's residence, the Nissan, and the Kia. *See* Rugg Decl. ¶ 6. Around 4:30 p.m., at the request of Rugg and Morant, Kavanaugh transported Lewis to the Sheriff's Office where Rugg and Tart made an unsuccessful attempt to interview him. *See* Morant Decl. ¶ 26; Rugg Decl. ¶¶ 7, 8.

Throughout the afternoon, deputies remained at the scene to secure it while detectives obtained a search warrant. *See, e.g.*, Morant Decl. ¶¶ 22-28. Sometime after Lewis had left, his mother arrived, and Morant told her she could not go inside the house. *See id.* ¶ 27. When shifts changed, Sergeant Teasley took over at the scene for Morant. *See id.* ¶ 28. At some point, a deputy permitted Lewis's mother and stepfather to enter the house to wait in the living room because of the dark and cold. *See* Rugg Decl. ¶ 10.

Late that night, detectives obtained search warrants for the residence and both cars, as well as arrest warrants charging Lewis for the Hoke County armed robberies. *See* Rugg Decl. ¶ 9. They arrived to execute the search warrants at approximately 10:20 p.m. and found incriminating evidence inside the house and the Kia Optima. *See id.* ¶¶ 10, 12-14.

Lewis ultimately entered *Alford* pleas to the Hoke County and Johnston County charges.

## II. PROCEDURAL HISTORY

Lewis brought this action against the defendants, claiming a violation of his Fourth Amendment rights because (1) Kavanaugh "failed to serve or prove the existence of the Johnston County warrant," (2) Kavanaugh failed to serve the Johnston County "warrant without unnecessary delay" in violation of the arrest order, (3) he endured a "period of confinement . . . following an arrest that was never made," (4) deputies entered onto the property without a warrant after they had taken Lewis into custody, (5) deputies seized his residence for approximately eight and a half hours "without a warrant, probable cause, or exigent circumstances," and (6) Hoke County and the sheriff failed to supervise and train the deputies. *See* Compl. ¶¶ 21-25; Am. Compl. ¶¶ 26-28.

The Court has since dismissed all claims against Hoke County and the sheriff. The only remaining claim against Kavanaugh arises from the alleged eight-and-a-half-hour search

and seizure of the residence while waiting for the search warrants, including the one-hour warrantless security sweep inside the residence. And all claims against Davis, Morant, and Rugg remain. *See* Order (Nov. 21, 2024) (adopting the recommended ruling), Docket Entry 55.

The defendants argue that there is no genuine dispute of material fact, they did not violate Lewis's constitutional rights, they are entitled to qualified immunity, and they are otherwise entitled to judgment as a matter of law. *See* Defs.' Mot. for Summ. J., Docket Entry 65. In support of their motion, they each submitted affidavits, as well as two pages from Lewis's testimony in state court, referenced *supra*. *See* Docket Entries 66-1 to 66-5.

In opposition to the motion, Lewis submitted his own Declaration, made under penalty of perjury. *See* Mem. of Law in Supp. of Cross-Mot. for Summ. J., Docket Entry 70-1; Decl. of Robert Lewis (Dec. 10, 2025), Docket Entry 70-2.[3] Lewis entitles his response as a cross-motion for summary judgment, but the deadline by which to file dispositive motions expired three months earlier, *see* Order (Sept. 6, 2025), Docket Entry 62, and Lewis did not seek leave to move for summary judgment at this late date. Even Lewis recognized that the filing is only a response to the defendants' motion and nothing more when he moved to deem his "*Response* to Defendants" Motion for Summary Judgment Timely Filed Due to Hardship." *See* Doc. 68 (emphasis added).

After granting Lewis's motion to deem his response timely, the Court afforded the defendants the opportunity to reply, which they have. *See* Defs.' Reply in Supp. of their Mot. for Summ. J., Docket Entry 73.

This matter is ripe for disposition.

## III. STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving

[3] Lewis also refers the Court to his "verified" complaint, but neither his original complaint nor his amended complaint is verified. Therefore, the Court cannot consider them as evidence when deciding the motion for summary judgment.

party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

"Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by 'showing – that is, pointing out to the . . . court – that there is an absence of evidence to support the nonmoving party's case.'" *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (quoting *Celotex Corp.*, 477 U.S. at 325). "If the moving party carries this initial burden, the burden then shifts to the nonmoving party, who must 'go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

## IV. DISCUSSION

### A. Qualified immunity shields the defendants from the eight-hour property seizure claim.

Lewis contends that the eight-hour seizure of his property while officers obtained a search warrant violated the Fourth Amendment.

The Fourth Amendment "protects property interests, and, specifically, an individual's possessory interest in property that belongs to him but has been seized by law enforcement officers," *United States v. Krueger*, 145 F.4th 460, 467 (4th Cir. 2025), for instance, when law enforcement is seeking a search warrant for that property, *see Illinois v. McArthur*, 531 U.S. 326, 331 (2001). For example, temporarily "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810 (1984).

Courts "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *McArthur*, 531 U.S. at 331. While this is a fact-specific inquiry, the Supreme Court's rulings

in *McArthur* and *Segura* provide guideposts for the analysis here.

Specifically, in *McArthur*, officers accompanied a woman to her home that she shared with her husband to keep the peace while she collected her belongings. *See id.* at 328-29. After she had done so, she told the officers that her husband "had dope in there" and had "slid some dope underneath the couch." *See id.* at 329. Her husband denied the officers consent to search, so they sought a search warrant, which they secured two hours later, and did not allow the husband to reenter the home unaccompanied during the interim. *See id.*

The Court considered (1) the probable cause the police had that the home contained evidence of a crime and contraband, (2) the good reason to fear that the husband would destroy the drugs before they could obtain the warrant, (3) the reasonable efforts to balance their law enforcement needs with the husband's right to privacy, and (4) the imposition of "the restraint for a limited period of time, namely, two hours." *See id.* at 331-32. Weighing these factors, the temporary seizure of the home was constitutional; "this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *See id.* at 332; *accord Krueger*, 145 F.4th at 467. Notably, "*McArthur* authorizes warrantless seizures of a home . . . 'no longer than reasonably necessary . . . *to obtain the warrant*,'" not to investigate. *See United States v. Elmore*, 101 F.4th 1210, 1218 (10th Cir. 2024) (emphases in original) (quoting *McArthur*, 531 U.S. at 332-33).

In *Segura*, the Court found, "under [the] limited circumstances" of the case, that the overnight seizure of an apartment was reasonable where "the officers focused first on the task of processing those whom they had arrested before turning to the task of securing the warrant," not an unreasonable decision given "that the proprietors of the apartment were in the custody of the officers throughout the period in question." 468 U.S. at 812. In addition, "it [was] reasonable to assume that" for much of the overnight delay "judicial officers [were] not as readily available for consideration of warrant requests." *Id.* at 812-13. And there was also "no evidence that the agents in anyway exploited their presence in the apartment." *Id.* at 812. Finally, because the individuals challenging the seizure of the apartment were under arrest and in police custody during the seizure, "[t]he actual interference with their possessory interests in the apartment and its contents was . . . virtually nonexistent." *See id.* at 813.

Applying these considerations here, the defendants acted reasonably, and, more important, there is no evidence

that any of the defendants caused the delay.

Rugg ordered Morant to seize the property, but only after first determining there was probable cause to seek a warrant (from Morant's information tying Lewis and the property to the crimes) and ordering officers to obtain one. *See, e.g.*, *State v. Lewis*, 831 S.E.2d 37, 38 (N.C. 2019) (recognizing officers had probable cause for the search of Lewis's home and car). And there are no facts suggesting that Rugg was responsible for the extended delay in obtaining the warrant. The same is true for Morant, Kavanaugh, and Davis. During a portion of their shifts, they were each responsible for securing the property, but they were not responsible for obtaining the warrant or the accompanying delay.

Furthermore, Rugg, Morant, Kavanaugh, and Davis are entitled to qualified immunity even had they caused the extended seizure. "The doctrine of qualified immunity 'balances two important interests,' namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from 'harassment, distraction, and liability.'" *Byers v. Painter*, 173 F.4th 155, 160 (4th Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"In resolving whether to award qualified immunity at summary judgment, courts are to engage in a 'two-pronged inquiry.'" *Nazario v. Gutierrez*, 103 F.4th 213, 230 (4th Cir. 2024) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655 (2014)). First, the court determines whether "in a light most favorable to the injury party – 'the officer's conduct violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Next, the court asks "whether the right at issue in the first prong was 'clearly established at the time' of the contested action." *Id.* (quoting *Pearson*, 555 U.S. at 227). "Accordingly, a court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established." *Id.* (citing *Pearson*, 555 U.S. at 227).

The court is required to define the constitutional right at a "'high level of particularity'" because "[t]he way in which an alleged right is described matters." *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (quoting *Ewards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999)). "Although a case directly on point is not required, existing precedent 'must have placed the statutory or constitutional question beyond debate.'" *Id.* at 505-06 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

"In the end, the key inquiry is whether 'the law provided "fair warning" that [the officer's] conduct was unconstitutional.'" *Atkinson*, 100 F.4th at 506. (quoting *Booker v. S.C.*

*Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (alteration in *Booker*)). To answer that question, courts look to precedent of the United States Supreme Court and, in this district, the Fourth Circuit Court of Appeals. *Id.*

In October 2014, these defendants would have believed their actions were reasonable. There was no clearly established law finding it unreasonable for deputies to secure a residence and cars for eight hours pending the issuance of a search warrant where there was probable cause to believe the residence and cars contained evidence of a crime and the individual with the possessory interest was under arrest and in custody.

Accordingly, Rugg, Morant, Kavanaugh, and Davis are entitled to qualified immunity for the claim that the eight-hour seizure of the residence and cars violated Lewis's Fourth Amendment rights.

B. The defendants are not entitled to summary judgment or qualified immunity as to the protective sweep.

The defendants are not entitled to summary judgment on Kavanaugh's and Morant's protective sweep inside Lewis's house or Davis's protective sweep of the property. The record evidence does not show, as a matter of law, that the basis for or the scope of the protective sweep was constitutional.

1. The protective sweep is an exception to the warrant requirement.

"'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *United States v. Jones*, 667 F.3d 477, 482 (2012) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)) (alteration removed). Nevertheless, "'because the ultimate touchstone of the Fourth Amendment is reasonableness,'" the United States Supreme Court "has identified certain 'narrow and well-delineated exceptions to the warrant requirement.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)); *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)).

One such "well-settled" exception is the protective sweep. *See id.* (citing *Marland v. Buie*, 494 U.S. 325 (1990)). "A 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 494 U.S. at 327. "The protective sweep exception requires more than a generalized worry of danger" or "a lack of information." *United States v. Everett*, 91 F.4th 698, 710 (4th Cir. 2024).

Instead, the Fourth Amendment requires that "articulable facts which,

taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

2. The record evidence of the *justification* for the protective sweep forecloses summary judgment.

The justification for a protective sweep is the protection of the arresting officers from the danger that person in the area to be swept poses to them and others. The nature of the crime under investigation and the potential presence of co-conspirators bear heavily on this analysis. For example, arresting members of a drug trafficking organization often supports this precaution. *See, e.g.*, *Everette*, 91 F.4th at 711 (affirming three-and-a-half minute protective sweep of Everett's residence where officers knew he was a large-scale drug distributor and had found firearms in the homes of his co-conspirators). *See also, e.g.*, *Jones*, 667 F.3d at 484-85 (affirming protective sweep where officers had seen known drug users at the house, some of whom officers knew carried firearms, and, at the time of the sweep, there were seven cars on the property when the Joneses claimed no one else was at the house).

In the robbery context, applicable here, courts have affirmed protective sweeps where more than one perpetrator was involved. *See United States v. Troy*, No. 13-15(1)(DWF/LIB), 2013 WL 1827676, at *8 (D. Minn. Apr. 11, 2013) (affirming sweep where suspect had used a firearm during the bank robbery two days earlier, two separate witnesses led officers to the defendant and his suspected accomplice, and officers knew the defendant was living at his accomplice's apartment), *report and recommendation adopted*, 2013 WL 1811297 Apr. 30, 2013). *See also United States v. Hardy*, NO. 2:23-cr-43-RAH-JTA, 2023 WL 3218639, at *2 (M.D. Ala. Apr. 13, 2023) (sweep affirmed where, just hours after an armed robbery of a gas station, officers learned the get-away car had arrived at a nearby hotel and the driver had exited the car with a gun and entered a hotel room, went to the hotel, and saw at least two people leave the room and believed the suspect remained inside), *report and recommendation adopted*, 2023 WL 3218504 (May 2, 2023), *aff'd*, 2024 WL 3691890 (11th Cir. Aug. 7, 2024). "Considering the totality of the circumstances," the court found that the officers "knew specific and articulable facts which gave rise to a reasonable suspicion justifying a protective sweep." *Id*. at *4.

However, simply because the suspect may have been armed earlier does not necessarily justify a protective sweep upon his arrest. For example, in *United States v. Day*, 2026 WL 904202 *5-6 (D.S.D. Apr. 2, 2026), the officers did not have reasonable suspicion to believe there was a

dangerous individual inside the arrestee's apartment. Officers responded to the defendant's apartment after a report that he had brandished a firearm at two individuals nearby, and, at the time, they also knew he and an accomplice were wanted on suspicion of a robbery five days earlier. *Id.* But he was alone when he brandished his firearm, there was no information anyone else lived with him, officers heard nothing from inside his apartment to suggest anyone was there, and, before the sweep, they had lingered outside of the apartment casually without any indication of concern for their safety from within the apartment. *Id.* The court explained that "[t]he mere possibility someone else is inside a residence is not enough to justify a protective sweep." *Id.* at *6.

Here, not unlike the officers in *Day*, Kavanaugh, Davis, and Morant had been at the scene and outside of the residence for a period of time before conducting the sweep, albeit the record evidence does not say for how long. And they never behaved as if concerned for their safety, much less for that of anyone inside the home. After arresting Lewis and detaining him in the patrol car, Kavanaugh approached the house, knocked on the door, and spoke with Lewis's grandfather about Lewis, his arrest, and the Nissan and Kia. He felt comfortable enough on the property to walk by the Kia to look through the windows on the way back to his patrol car. He then radioed Morant to report the conversation and what he had seen in the car.

Morant arrived on scene, walked over to Kavanaugh for an update, and then proceeded to call Rugg. And it could not have been a short call: Morant recounted the overnight report from Smithfield about their robbery, the suspect, his car, and his residence, Kavanaugh's morning surveillance and afternoon return to the residence during which he saw and arrested Lewis. After that call, he and Kavanaugh walked to the house to spoke with Lewis's stepfather on the porch.

Not only had all of this taken place since Lewis's arrest, but, at the time of the sweep, none of the robbery reports – from Hoke County or Smithfield – noted an accomplice. Kavanaugh had not seen anyone else at the residence all morning. There were no additional unaccounted-for cars in the driveway. Morant's refusal to take the word of a stranger does not justify the sweep under these circumstances. *See Jones*, 667 F.3d at 484 ("[A]llowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep."). And "a generalized worry of danger" is no more sufficient to justify a protective sweep. *See Everett*, 91 F.4th at 710; *see also Jones*, 667 F.3d at 484 ("[A] lack of information cannot provide an articulable basis upon which to justify

a protective sweep."). The record evidence does not support a finding, as a matter of law, that the sweep was justified.

The same holds true for Davis's protective sweep of the yard during which time he photographed the storage barn in the backyard and the inside of the cars. The Fourth Amendment not only protects the home from unreasonable search and seizure, but it also shields the home's curtilage, "the area 'immediately surrounding and associated with the home.'" *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The same issues that plague Morant's and Kavanaugh's protective sweep of the house undermine the propriety of Davis's warrantless entry onto the property to walk around the yard taking photographs. *Cf. United States v. August*, 136 F.4th 595, 599, 601 (5th Cir. 2025) (upholding a protective sweep of a backyard when officers responded to a shots-fired call).

3. The record evidence of the *location* of Lewis's arrest forecloses summary judgment.

In addition to officers' knowledge and reasonable inferences, courts also consider the proximity of the arrest to the area to be swept. That is, an arrest "just outside," as opposed to inside, a home may still support the need for a protective sweep. *See Jones*, 667 F.3d at 485 n.10 (joining other circuits and finding that a protective sweep may be justified even when officers arrest the suspect "just outside the residence"); *see also United States v. Green*, 599 F.3d 360, 376 n.16 (4th Cir. 2010) (finding that "officers were fully justified in entering the residence even if [the arrestee] was seized outside the threshold [of the house] [because] officers clearly saw" other people in the house, and people who posed a threat to the if not secured).

But what does it mean to arrest someone "just outside the residence?" An arrest on the patio, on the porch, outside the threshold, or on the ground just feet from the door is close enough. *See, e.g.*, *Jean-Laurent v. Hunt*, No. 5:23-CT-3231-FL, 2026 WL 1494464, at *2, *4 (E.D.N.C. May 28, 2026); *United States v. Cleckley*, No. 24-cr-00329-LKG, 2026 WL 1265431, at *3 (D. Md. May 8, 2026); *United States v. Wingrove*, No. 2:19-00176, 2019 WL 5777646, at *2 (S.D.W. Va. Nov. 5, 2019). But arresting a suspect outside of the fence in front of his home, without any facts concerning officer safety, did not support the need for a protective sweep when the officer admitted that "[he] could have just put [the suspect] in the car and driven away." *See United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) (first alteration in *Hogan*).

Here, there is no record evidence of the distance from the site of Lewis's arrest to his residence. But there is no dispute that Kavanaugh arrested and detained Lewis at the mailbox across the street from his residence, at which

point the deputies could have left the scene. Instead, Kavanaugh exposed himself *twice* to the alleged danger inside the house when he walked across the street to talk with Lewis's stepfather. And this alleged danger failed to stop Morant from joining Kavanaugh the second time.

4. The record evidence of the *length* of the sweep forecloses summary judgment.

Even when there is a basis for a protective sweep, it can last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-36. Kavanaugh and Morant each aver the protective sweep took no more than two minutes. On the other hand, Lewis avers that it took an hour, which is longer than the record evidence shows was necessary to answer their safety concerns. This is a genuine dispute of material fact.

5. The record evidence of the *extent* of the sweep forecloses summary judgment.

"A protective sweep . . . does not entitle officers to conduct a full search of the premises, but rather extends only to a limited inspection of spaces where a person may actually be found." *United States v. Green*, 599 F.3d 360, 376. Lewis asserts that Kavanaugh and Morant viewed the contents of his cell phone during their protective sweep.[4] The law would not support such a search without a warrant, as no exception to the warrant requirement would apply under these circumstances.

6. The record evidence of the *consent* to conduct the protective sweep forecloses summary judgment.

Another well-settled exception to the warrant requirement is valid consent – "either from the individual whose property is searched or from a third party who possesses common authority over the premises." *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted). "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *See United States v. Matlock*, 415 U.S. 164, 170 (1974); *see id.* at 179 (describing the absent defendant as being "restrained in a squad car a distance from the home") (dissent)). This "[c]ommon authority rests on the mutual use of the property by persons generally having joint access or control for most purposes . . . ." *Id.* at 171 n.7 (noting the assumption of risk that a co-

[4] The defendants' opposition to this evidence is their contention that the "claim is absurd." *See* Defs.' Reply at 15 n.5. That assertion bears directly on witness credibility, which is the province of the jury to assess.

habitant may permit the search of the common area).

Since *Matlock* and *Rodriguez*, the United States Supreme Court has drawn a "fine line" in this context. *See Georgia v. Randolph*, 547 U.S. 103, 121 (2006). That is, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.*

To determine if a third-party's consent to enter is valid, courts ask if a reasonable officer, in possession of the facts known to the officer at that time, would be warranted in believing "the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 189 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). Furthermore, even when a third-party's consent is valid, officers may not exceed the limits of that consent. *See United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993).

Here, Lewis's stepfather gave Kavanaugh and Morant consent to search the house, and Lewis has presented no evidence to dispute this. But whether the execution of the protective sweep complied with the confines of that consent is an open question. Lewis's stepfather consented to the defendants' request to conduct a *quick* protective sweep. As explained above, there is a genuine dispute as to the length of time of the sweep. If the sweep lasted as long as Lewis claims that it did, the evidence forecloses a finding as a matter of law that the hour-long search was a quick sweep. In addition, Lewis contends the defendants reviewed the contents of his unlocked cell phone, which was in his bedroom, which forecloses the conclusion that the defendants merely searched the common areas to which the consent extended for people who could pose a danger.

Furthermore, there is no evidence that Lewis's stepfather consented to Davis walking around the yard, much less taking photographs while he was doing so. In sum, the Court cannot conclude as a matter of law that the defendants' warrantless search of the residence was a lawful protective sweep.

7. The defendants are not entitled to qualified immunity on the protective sweep claim.

At the time of the defendants' protective sweep, the following right was clearly established: the right to be free from the warrantless search of a home, absent the reasonable belief based on specific and articulable facts and their inferences at the time of arrest in or just outside the home "that the area swept harbored an individual posing a danger to the officer or others." *See Buie*, 494 U.S. at 327, 335. It was also clearly established that a co-tenant's consent to search a residence only extends to areas of joint access or control, *see*

*Matlock*, 415 U.S. at 479, and officers may not exceed the limits of consent, *see McFarley*, 991 F.2d at 1191.

Accordingly, based on the record evidence, the defendants are not entitled to qualified immunity on the protective sweep claim.[5]

C. The state law claims, to the extent Lewis asserted any, do not survive.

In his Complaint, Lewis refers to claims of trespass, false arrest, false imprisonment, and state due process in his "Basis for Jurisdiction" paragraph to explain the supplemental jurisdiction over those claims. *See* Compl. at 4 ¶ B. He does not specifically mention those claims again. Nor does anyone else – at the motion to dismiss or the motion for summary judgment stage. Lewis's filings have focused on the § 1983 constitutional claims against the defendants. And he did not lodge any objections to the earlier Report & Recommendation on the basis of any state law claims against the defendants. In other words, the parties have litigated this case as though Lewis only asserted § 1983 claims against the defendants, and the Court has similarly interpreted Lewis's claims for relief.

Even so, the Court's dismissal of the § 1983 claim against Kavanaugh for arresting Lewis on a Johnston County warrant would foreclose his claims of false arrest and false imprisonment. *Compare* Order and R. of U.S. Mag. J. (R&R) at 22 (finding it was reasonable to believe there was probable cause), Docket Entry 44, *recommended ruling adopted*, Order, Docket Entry 55 *with Williams v. City of Jacksonville Police Dep't*, 599 S.E.2d 422, 430 (N.C. Ct. App. 2004) ("Probable cause is an absolute bar to a claim for false arrest.") *and Myrick v. Cooley*, 371 S.E.2d 492, 494 (N.C. Ct. App. 1988) (recognizing that false arrest is one way to commit false imprisonment). In addition, the Court noted that, to the extent Lewis was asserting a trespass claim, it failed. *See* R&R at 8 n.3. For all of these reasons, in addition to the requirement that there be no adequate state law remedy, the state due process claim would fail.

[5] As they did in their motion to dismiss, the defendants argue the absence of Lewis's compensable injury. *See* Br. in Supp. at 33-35. But, as they acknowledge, Lewis may nevertheless be entitled to nominal damages. *See id.* at 35 n.10. *See also White v. City of Greensboro*, 608 F. Supp. 3d 248, 266-67 (M.D.N.C. 2022) (recognizing that, even in the absence of compensatory damages, a § 1983 plaintiff may recover nominal damages).

## V. CONCLUSION

It is hereby **RECOMMENDED** that the Defendants' Motion for Summary Judgment be **GRANTED IN PART** as to the seizure of the property pending a search warrant and **DENIED IN PART** as to the protective sweep.

JoAnna Gibson McFadden
United States Magistrate Judge

August 28, 2026
Durham, North Carolina